Good morning ladies and gentlemen. The first case for this morning is Citizens for Appropriate Rural Highways v. Anthony Foxx. Mr. Harrison. Thank you, Your Honors, with Your Honor's permission. Your Honors, I'll start with count 8 and then move to count 7, 13, 17, and 18. Count 8 was dismissed as a clear error of law by the District Court. This was the bad faith performance of an environmental impact statement by defendants. The count was requested to be dismissed only in part by the defendants. The defendants filed a partial motion to dismiss, requesting only four paragraphs to be stricken. Mr. Harrison, I'm going to stop you right there because I'm going to ask you why with when she said you waived any argument with respect to the timeliness of a portion of that count by waiting the 18 months to file your motion to reconsider, I have been trying to figure out why you did not seek immediate reconsideration if you believe she had erred by dismissing the entire count in its entirety. I understand your question, Your Honor. Yeah. I think it would have been the better practice to bring it to the judge's attention immediately as it happened because of other events happening in the case, including this whistleblower disclosure from an in-and-out employee to plaintiff's counsel, that would be me, and the voluminous administrative record that we were trying to sort through to see if the plaintiff could supplement the record. I actually had other priorities. Now, Your Honor, I think it's a better argument for defendants to say that the court was not obligated to grant our motion to reconsider based on the points Your Honor raises, but it doesn't eliminate the plaintiff's right on appeal to seek review of any count dismissed because the interlocutory appeal would not normally have been available, and the plaintiffs will not waive their right to seek appeal of an erroneous, illegal dismissal of a count by not having filed a motion to reconsider at all. We had no obligation to ask the court to reconsider early, midterm, or late. That is a discretionary option. We preserved our right, the law preserves our right, to appeal as we are now doing on that dismissal, and I believe that decision by the district court to dismiss this count, which was clearly an error because it wasn't asked to be dismissed in its entirety, is something that Your Honors have an obligation to deal with. But you don't think you had an obligation to not wait 18 months? Well, I think I should have done it sooner, Your Honor, but I mean, there are some extenuating circumstances here, and I don't want to spend too much time on those, but we had an unexpected fraud that was happening that we caught. We had a voluminous record that was so demanding it took us months to go through. I thought I was going to have four, maybe three other attorneys help me on the case. That didn't happen for reasons I won't bore you with. So I did the best I could. I was doing this case essentially pro bono on a statutory contingency, and yes, would it have been better practice? I agree with you. Were we obligated to do it under the law? The answer is no. So, in regard to Count 8, the district court acknowledged that this was on the summary judgment decision later in the case. The district court acknowledged that it was a close question whether the defendants had prepared the Section 4 EIS in bad faith, but the court noted that our claim that it was deciding on summary judgment, Count 7, not Count 8, was not about bad faith preparation. It was about supplementing the EIS. So the court didn't really reach the question, but if the whistleblower evidence that I brought forward in my declaration had been allowed to be considered by the court, it is the appellate's view that we would have made the case on that close question. We were never given the opportunity to do that, and we believe Your Honor should remand the case so that close question on the bad faith preparation of the EIS for Section 4 can be decided by the court, considering the whistleblower evidence that has so far been excluded. Would your answers be pretty much the same if I asked you whether Counts 9 and 13 through 18, why the arguments as to the ripeness of those counts were not waived, since you did have a chance to explain why they were ripe when the summary judgment motions were brief but remained silent? And the problem is this is civil litigation, so there really is no plain error. And I'm wondering, and I've been wondering if you, why, I should say, you didn't commit waiver by remaining silent as Judge Barker concluded, and as the defendants are arguing on appeal? The Counts 13, 17, and 18 raise a somewhat different question, Your Honor, because their jurisdictional, the issue is jurisdictional in nature and the ripeness, so it is plain disposition which we stated in our brief that the jurisdictional question cannot be waived and has to be decided both by the district court and the court of appeals. Now, I would also add that it would have been... You see, when courts say that jurisdiction can't be waived, they're talking about a lack of jurisdiction. Here, you are saying there was jurisdiction, but the point, again, is that that was an argument that should have been made, it seems to me, in response to the defendant's summary judgment motions rather than waiting until appeal. I understand Your Honor's point, but again, there's a distinction between what's better practice and what's the law and what's a waiver. The jurisdictional obligation on courts is not just limited to one side of the coin. There is an obligation on the courts to look at the absence of jurisdiction and also the presence of jurisdiction. Just like the court can't accept a case for which it has no power or authority to hear, it also has an obligation to accept a case when jurisdiction is present. Now, under a federal statute, 28 U.S.C. 1653, I believe, jurisdictional facts can be raised at any time, including on appeal, including amending a complaint on appeal to raise jurisdictional facts. That statute is simply a recognition of the principle that the jurisdictional obligation on courts is two-sided and continues throughout the case. So I agree with Your Honor that it would have been better practice, and if Your Honor wants an explanation of why I didn't do it, I can give one. At the time that this motion to dismiss a motion for summary judgment was filed, after I finished all the other arguments, I got to this argument and I asked myself, what are they talking about? These counselors are trying to dismiss as unrivaled. They know they were filed after the ROD, but now they're pretending they were filed on some legal technicality that, to my knowledge, didn't exist, pretending they were filed before the ROD. Could, could, I'm going to take you somewhere else because you don't have a lot of time. Sure. Could you explain to us exactly what fraud you think or was being perpetrated on the court? Because it seemed to me that the dispute over the relevance of the 2009 vehicle fleet data is anything but a secret. So even if there was an attempt to delay that information, the public release, let's say, of that data, I'm not sure what the actual fraud is. That's a key question, Your Honor. The, the fraud comes in play not at the initial stage of the decision to not use the 2009 data, which we've argued is in bad faith with the record reference that we've given, but at the later stage, when after we had been given this whistleblower disclosure, we asked for subpoenas to put witnesses on the stand to put this whistleblower on the stand, among others, and we were denied. But the court, in denying our subpoenas, gave us something. The court gave us limited paper discovery for documents, and we asked the court for the documents on this concealment of the 2009 air data and this other issue of this Appendix NN, which we're not talking about at the moment. Now, because we were allowed to ask for that in that limited discovery, the defendants were forced to give those documents to us, and they did, okay, but those documents did not include the key disclosure by the whistleblower, which was that Federal Highway Official Larry Heil directed the NDOT, the State Department of Transportation, to withhold that 2009 data, not because it needed quality assurance, which is the official story you're still hearing from the defendants, even in the briefs to this court, but because they wanted that data to be held until the ROD for Section 4, or Act 69, was issued. In other words, they wanted to make sure that this project got approved before they had to address this issue. Now, if you look at the documents that were disclosed, the defendants admit, and there's no dispute at the moment, that those documents show they ran this new data through their computer models, they showed noncompliance with the Clean Air Act, so they knew what was going to be the problem. So the direction from a federal official to the state agency, don't release this data until you issue this approval, is where the, is, pardon me, is almost where the problem comes in. Then, when we did the discovery request, counsel for the defendants asked the whistleblower, basically, to give his documents over, I know this because the whistleblower told me later, and that's in my declaration, and they asked him, is there any smoking gun evidence, which gets to the heart of your Honor's question, and the whistleblower said yes to that question, and he said, Larry Heil from Federal Highway told my boss and me, don't release that data until after the ROD is issued. But you see, that declaration constitutes multiple levels of hearsay, so it can't really be relied on for anything except perhaps as a justification for discovery. And secondly, it seems that the problem with the 2009 vehicle fleet data was already, had already been disclosed in the administrative record, so whatever attempts there might have been at delaying release of the data, the fact that the 2009 data was less favorable was already known. So the problem had been aired, so it doesn't seem as if defense counsel was acting in bad faith. Well, Your Honor, there are a couple problems there. One is, and we've briefed this, that admission by Larry Heil, official of the defendant, is not hearsay. It's defined to be not hearsay under 801. The recounting of that admission by another official of the defendant, the whistleblower, who's not an honorist, by the way, we know his name, I met with him personally, that's not hearsay either, because that's an admission under 801. You don't have to be a high-level manager to be an employee acting within the scope of your employment and making a statement in that regard, which is what happened here. Now, my affidavit might normally be hearsay, but on a motion for summary judgment, affidavits are allowed. So I would respectfully disagree with Your Honor's point on the hearsay, but when you're talking about fraud in the court, and I'll finish my time and it will be up for my primary argument, but when you're talking about fraud in the court, hearsay really shouldn't be the consideration. The court has an independent obligation to inquire into a potential fraud in the court. When an officer of the court, in this case me as an attorney, makes a detailed statement in a declaration that an inside whistleblower from an opposing party has disclosed intentional violations of a federal statute and then is continuing to misrepresent through attorneys to the court a false story, the hearsay question shouldn't be the controlling factor. The duty to inquire and correct the fraud should be the factor. I appreciate your attention. Thank you, counsel. Thank you. Thank you. Mr. Masonette. Thank you, Your Honor. My name is James Masonette. I'll be representing the federal defendants here today. I will be sharing my time with Mr. Al Furlow at counsel's table, who is representing the Indiana Department of Transportation. So I could respond to some of the points made by opposing counsel. He started with count eight. He said it was a clear error of law for the district court to dismiss those elements of count eight that challenged section four because, and we submit that it was not an abuse of discretion for the district court to find that Mr. Furlow had waived those claims. It wasn't the district court's job to root through his complaint and find the handful of paragraphs in count eight that challenged section four. It was his job, and he didn't do it at the time. He had an obligation to defend his claims or at least file a timely motion for reconsideration. Now, he says that as a matter of law, he's not barred from raising this issue on appeal, and I think that's technically correct. But what he has not succeeded in doing is showing that the district court abused its discretion by concluding that he had waived his claims. Even if this was a clear error of law, the district court was well within its discretion to conclude that he had waived the claims by not bringing them up in a timely way. And this issue is important, Your Honors, because this is part and parcel of the way that CAR has conducted itself throughout this case. It brought 18 claims challenging I-69, but it hasn't pursued those claims diligently. It filed this case in August of 2011, and it didn't file its motion for preliminary injunction until three months later. It didn't file its brief supporting that motion for preliminary injunction until three weeks after that. The court set a hearing for that motion on February 14, 2012. Now, that hearing date was ultimately vacated because the parties got bogged down in administrative record issues. Once those issues were resolved, the district court bent over backwards to give CAR an opportunity to argue that preliminary injunction motion, but CAR never requested a new hearing date. Seven months later, the district court dismissed that original PI motion because CAR had simply failed to pursue it. If CAR had pursued its original preliminary injunction motion, its challenge to Section 4 could have reached this court three years ago. But CAR didn't do that, and it continued to pursue its claims fitfully during summary judgment. For example, when we moved to dismiss some of its claims, CAR didn't respond. On summary judgment, it didn't argue the merits of half of its 18 claims. Its conduct here has been so extreme that the district court nearly dismissed the entire case for lack of prosecution. Let me, counsel, let me ask you, though, before you speed past Count 8, didn't you only ask to dismiss part of Count 8? Yes, we only moved to dismiss certain paragraphs of Count 8, and the district court did dismiss all of Count 8. So was that decision by the district court to dismiss all of it, was that error? Probably. I mean, she granted more relief than we had asked for. But whose responsibility was it to call the court's attention to the fact that there were parts of Count 8 that addressed not just Section 3 but Section 4? It was CAR's responsibility. So you're conceding it's error, but I presume you're saying it's harmless error. I'm saying it's harmless error, and I'm saying it was not an abuse of discretion for the following 18 months. CAR could have moved for reconsideration immediately. It could have raised this issue in its summary judgment papers. Instead, it waited until after the entire case was decided to raise these issues, and that's how CAR has conducted the entire case. And all of that matters now because what CAR is asking this court to do is to resurrect claims that it abandoned in the district court. Now, CAR was free to choose, for example, arguing half of its 18 claims on summary judgment. We all make decisions in litigation. We advance some claims. We abandon others. CAR made its decisions, but it has to live with those decisions. It doesn't get to start over again now just because it lost. So we would ask, and obviously this court has held that counts that parties can waive their claims by not arguing them in cases like Goodpasture v. City of Indianapolis. Was there an effort to delay the public release of the 2009 vehicle fleet data? The plaintiffs, you know, seem to suggest in their reply brief that the updated compliance status of Greene County may itself be the result of manipulated data or relaxed standards. So that's two issues. Let me take the first one, which is, is there any evidence that shows that there was any effort to delay the use of the 2009 fleet data? I would submit, Your Honor, that there isn't. If we turn to the administrative record, what happened with the full saga of the quality assurance of the 2009 fleet data is set out in the final report that was prepared on the quality assurance. And you can find that counsel for NDOT attached it in a supplemental appendix to NDOT's brief. And if you look at the supplemental appendix on pages 55 through 58, you'll find the story of why it took as long as it did to do quality assurance on the 2009 data. The bottom line is the data was delivered in June of 2010. The interagency committee that gets to decide what data to use, which was not just Federal Highways and the Indiana Department of Transportation, but also included the United States Environmental Protection Agency and Indiana's Department of Environmental Management, spent some time deciding whether they should use the old data or the new data. They were concerned that the new data looked off, that it showed an older vehicle fleet than you would have expected, so they wanted to quality assure that data. They knew that the law didn't require them to use the 2009 data because the law says you use the data that's in place when you start your conformity determination. And they knew that EPA guidance said you shouldn't use data until it's quality assured. So they asked Indiana to undertake the process of quality assuring this data. And as this report explains, Indiana then encountered a series of funding obstacles, and it took them until December of 2010 to get the funding online. It was then subject to further scrutiny by the state budgetary process, and it wasn't until May 2011 that they issued a notice to proceed on that contract, and the review was finally done in December of 2011, after the record of decision was signed for Section 4. So they didn't need to delay the quality assurance of the 2009 fleet data, because they could lawfully and rationally rely on the 2004 fleet data. But in addition, if you look at the emails in the record, these are from Larry Heil, and Larry Heil is not a manager or director at the Federal Highways Administration. It wasn't his decision on what data to use. As I've said, it wasn't even the Federal Highways Administration's decision. It was the decision of an interagency committee that included EPA. But if you look at the emails in the record, you'll see that far from wanting to delay the quality assurance of the 2009 fleet data, his approach to this was, we should get this done as soon as possible. We should get this done because we need a contractor to get this done if we're not going to be able to make our conformity determinations. That's going to result in a three to nine month delay while we amend the state implementation plans, adjust the budgets. Because fundamentally, the problems in air quality in Greene County are not from cars. They're from regional power plants. So there were steps the agencies could take to amend the state implementation plans, comply with the Clean Air Act, even if they had to use the 2009 fleet data. How many counties are involved in this? Because where section four falls partly in Greene County, and Greene County was in what's called maintenance in Clean Air Act charging. It had violated the Clean Air Act in the past. So that was what drove this issue. What was the nature of the violation? It was the eight hour ozone standard. So the way the Clean Air Act works is it had been in noncompliance before. And after a while, after you comply, you go into what's called a backslide. And now Greene County has moved from maintenance into full attainment, which means that the air quality there is fine. And this analysis would not be required if the agencies were doing this today. Anyway, my point was this email, if you look at it, it's at SPAR962. Larry Heil, who is according to the plaintiffs at the center of this fraud, says the bottom line is that it's critical that NDOT fund this review now. What he says is, so we need to get this consultant on now, in all caps. And he says that the longer NDOT waits before getting a resource on board that can make this happen, will be that much more time that all of our air quality areas remain in a freeze where new conformity findings can't be made. Now, was Larry Heil concerned that using the 2009 fleet data might delay the construction of this road and result in millions of dollars of additional costs? Yes, he was, and the record shows that. Does the record show that Larry Heil somehow tried to delay the use of the 2009 fleet data? It does not. Again, it wasn't Larry Heil's decision in addition to all of that. And finally, these issues are just moot at this point, because if this issue were remanded to the agencies now, they wouldn't have to make a further conformity determination because Greene County is now in compliance with the Clean Air Act. And because the 2009 fleet data is not the most recent data. The plaintiffs seem to suggest that notwithstanding the status of Greene County, a court could still declare the record of decision, you know, that determination to be invalid. Is that correct? You know, it's... That's in their reply brief, I believe. Right. It renders the issue moot. The court could still decide that the issue, even though it is moot, it would be an advisory opinion. It would have no effect. You know, we've argued, of course, that it's a rational, lawful decision. I should return, Your Honor, to one other question you asked, which was the suggestion that the overall Clean Air Act process in Greene County was influenced by this 2009 fleet data issue. And I don't see that there's any evidence that that's true. This is... The conformity determination is done by this committee as part of the I-69 project. Greene County's status under the Clean Air Act is a much larger issue that involves the Indiana Department of Environmental Management, EPA. EPA rescinded the eight-hour ozone standard that Greene County had violated in the past. And then Greene County came into compliance with the Clean Air Act. Those are issues that are much different from folks and don't have anything to do with the 2009 fleet data. I realize that I'm into your time, but maybe Judge Keene will help us all out. Sure. Go ahead. Because I would like you to address the plaintiff's contention that if the federal defendants relied on the so-called white paper analyzing the Munson route, that they were required to provide that paper to the public. So the way NEPA works, Your Honor, it worked exactly as it's supposed to work. They published the route, their analysis of alternatives, and the route that they preferred. Dr. Munson, during public comment, said, hey, here's an additional route you should look at. They looked at that, and then in the final environmental impact statement, they explained at length how they reviewed it, met their conclusion that it didn't make a significant difference in the number of car speeches affected, and the fact that it fell outside the I-69 corridor was a serious issue, and they eliminated it from consideration for that reason. That's all they had to do. They don't have to start the process over again because Dr. Munson said in his proposals, they're supposed to respond to public comments in the final environmental impact statement. That's what they did. Now, as far as the so-called appendix at the end, that analysis, they started to draft it up in a separate appendix, and then later incorporated it into the response to comment section of the final environmental impact statement instead. But the public didn't lose anything. The agencies put their proposal out, they received a substantive comment, they analyzed it and responded to it, and rejected it for reasons that are rational and lawful. Thank you, Your Honor. Mr. Frillo? Thank you, Your Honor. Bay Police Court, Albert Frillo for NDOT. Just to follow up on the appendix and Anne in the white paper, the NDOT's obligation to... NDOT was engaged in federal highways, we engaged in a tiered analysis for this highway. And in tier one, it had established a corridor. And the tier one record of decision said that you have to stay within the corridor unless you need to go outside of the corridor to avoid significant impacts. And in the section four record of decision, NDOT... I'm sorry, federal highways interpreted what that language meant in the section, in the tier one rod. And they said, unless you've uncovered substantial impacts at a level that was not anticipated, you have to stay in the corridor. So to the extent that there were these two alternatives that took five or seven miles out of the 27 mile length of the entire section to go outside the corridor, an analysis of the impacts that were to be avoided, and these alternatives were put forward as avoiding karst impacts. Federal highways took a look at whether or not, first, were the level of karst impacts greater than was anticipated? And they said, no. And then they looked and said, does this alternative, or these proposed alternatives that go outside the corridor, help in any material way? And the determination that they made on that was, no, in fact, they don't. We don't meet our own standard for going outside the corridor, or these two alternatives don't meet that standard. So we're gonna not look any further at those alternatives. There was a white paper that was done that looked at a broader range of impacts that would be caused by these other two alternatives. That paper is part of the record. It was given to plaintiffs in a public information request. But it's not relevant, really, to the determination that Federal Highways made in interpreting its own Tier 1 record of decision and the standard that they set up to look at alternatives outside the corridor. Are you saying that, well, the plaintiffs contend that if the federal defendants relied on that so-called white paper analyzing the Munson Route, they were required to provide that paper to the public. Are you saying they were not required to do so? Well, Your Honor, for NEPA purposes, the agency has to exercise a level of discretion as to what information is put out as part of the Environmental Impact Statement and appendices. NEPA does not require the federal agency to put every piece of information that it has into an appendix that accompanies the Environmental Impact Statement. If that were the case, then the entire administrative record, which is hundreds of thousands of pages in this case, would be required to be somewhere as an appendix distributed to the public as part of the Environmental Impact Statement. So does the public just have to go on trust? It goes... That you know you're doing what you say you're doing? Well, to an extent, yes, Your Honor. That's part of... That's the nature of administrative law and practice as you go forward with these types of projects. The important thing with that white paper is that the other impacts that were analyzed in that white paper aren't relevant to the decision made by Federal Highways to whether or not they're going to look at an alternative outside of the corridor that had been established in Tier 1. But so say you. How can they... The agency is imbued with a level of discretion to determine what their own language in Tier 1 meant. In Tier 1, they established a standard for looking at alternatives outside the corridor that to decide to go outside the corridor if they needed to avoid significant impacts. In Section 4 at the Tier 2 process, they looked at these proposed alternatives and they said, here, our standard requires... It allows us. It doesn't require them. It allows them to look at alternatives outside the established Tier 1 corridor under certain conditions. And what they did was they said, we've looked at these alternatives. We know what we're experiencing within the Tier 1 corridor. We have not encountered impacts that were unexpected or at a level that was unexpected. We have no reason ourselves to go outside the corridor. Let's look and see if these two proposed alternatives that came up as a comment on the draft EIS, do they really help avoid impacts that were unexpected? First, there are no unexpected impacts within the corridor. Second, the level of impacts in these two proposed alternatives was not so significantly or materially different that would allow federal highways to choose to go outside the corridor. And going outside the corridor would be a significant change in the direction of the project where people's expectations had been centered upon what this corridor... The corridor established in Tier 1, which was in 2004, brought to the public and what the public expected. I see my time has expired, but... Council, how much has this been completed? How much of this I-69 has been completed? The road is, right at this point in time, 90% complete. It should be open to traffic by the end of the year. All right, so now the area we're talking about is the one that has to be adjusted if the... We would wind up building another road if those alternatives were found to be but the agency, I would submit, has not abused its discretion in deciding to stay within the established Tier 1 corridor. Thank you. How much time? You have two minutes, Council. Your Honor, on this last point about the defendant's focus on the Tier 1 ROD requiring the agency to stay within the corridor, the defendants are confusing the substance or merits of their decision-making process with NEPA, which is a procedural statute. NEPA is about the process of making the decision, not about the outcome of the decision. So in terms of this Munson alternative assessment, whether or not the agency might have eventually been justified in rejecting that alternative, they were not justified in keeping their analysis secret, and that's the NEPA point. The defendant said that they have some discretion in terms of what documents to release and not to release in regard to this 30-page white paper, but the defendant's own briefs cite to the federal regulation that requires underlying documents to be released to the public. An underlying document would include any analysis that they relied on, for example, to respond to public comments, which is what they did in this case. The defendant said that they had incorporated this 30-page white paper into public comments, but what the public got was a three- to four-page set of conclusions without the underlying analysis, and that's not what NEPA is about. NEPA is about transparency and letting the public see the agency's reasons and the agency's evidence and commenting on that. Mr. Harrison, I'm going to switch gears before you run out of time. In terms of your allegations about fraud and conspiracy, and I guess the simplest way I can say it is, this doesn't smell like a fraud to me. Fraud usually involves concealment and attempts to hide. All we're hearing, even as defense counsel got up and read some of the emails, it was all out in the open. I mean, help me out. Tell me what admissible evidence you have, meaningful admissible evidence you have, that would show there was some type of fraud or conspiracy. Well, first of all, Your Honor, as I noted before, the court has an obligation to create a record on a fraud on the court allegation when it's made in good faith by counsel. In this case, my affidavit declaration was admissible, as I've explained. I had this end-odd employee sitting in front of me. My time is up, Your Honor, should I finish this? No, go ahead. Please finish. Thank you. So I had this employee sitting in front of me. I had a witness to the conversation, by the way, and this employee was highly educated. He was telling me, you know, at risk of his own job and livelihood and his family's support, he was saying, look, I was told, end-odd was told, do not release this data until the ROD comes out. And when defendant's lawyers came to me and they asked me, do you have any smoking gun evidence, I told them yes, and I told them that this instruction had been given to conceal, withhold this data until after the ROD. It's that where the fraud occurs, because it's officers of the court deciding to conceal material facts and continuing to misrepresent to the court a false story that they know to be false. This whistleblower told defendant's counsel what the whistleblower told me. So that's where the fraud on the court comes in, is officers of the court concealing material facts and then misrepresenting facts to the contrary. Thank you, Your Honor. I appreciate it. Thank you. Thanks to all counsel. The case will be taken under advisement.